**198** CITY OF NEW YORK *v.* BROOKLYN, Q. CO. & S. R. R. CO.

First Department, May, 1917. [Vol. 179.

THE CITY OF NEW YORK, Appellant, *v.* BROOKLYN, QUEENS COUNTY AND SUBURBAN RAILROAD COMPANY, Respondent.

First Department, May 4, 1917.

**Railroads — liability of street surface railroad operating from Brooklyn to city of New York for percentages of gross receipts under section 175 of Railroad Law — statute construed — right to cross bridges a license not a franchise.**

Section 175 of the Railroad Law provides, in part, as follows: " Every corporation building or operating a railroad or branch or extension thereof, under the provisions of this article, or of chapter 252 of the Laws of 1884, within any city of the State having a population of 1,200,000 or more, shall, * * * pay into the treasury of the city in which its road is located, * * * three per cent of its gross receipts * * *."

In an action brought by the city of New York to recover percentages on gross receipts from the operation of the defendant's railroads within said city during the six years ending September 30, 1907, and penalties thereon, pursuant to the provisions of the above section, it appeared that the defendant, a domestic street surface railroad corporation, was organized in 1893 to operate in the county of Queens; that all of its franchises are based upon consents granted to other corporations merged with it, which corporations were all in existence prior to 1884; that all of such franchises involved in this case were granted prior to 1892; that at the time of the enactment of the above section in its present form, and at the time of defendant's incorporation, the population of the city of Brooklyn was considerably under 1,000,000, but had increased to 1,200,000 by 1905 and has since exceeded that number, and that prior to 1892 the section of the former Railroad Law made 250,000 instead of 1,200,000 the minimum limit of population.

Provisions of the present Railroad Law and of the prior statutes relating thereto examined, and *held*, that the defendant is not liable for the percentages on its gross receipts; that when it took over the operation of the railroads of its constituent companies in the city of Brooklyn, the population of which was under the limit fixed by the statute at that time, said statute did not apply to it, and its franchises were complete, vested and unassailable, and the statute was not subsequently made applicable by the change in the limit of population.

If there are any doubts as to the construction of the statute, it being a taxing provision, they should be resolved in favor of the taxpayer, in this case the defendant.

As the percentage of gross receipts is only payable by corporations building or operating under the Railroad Law or under the act of 1884, the statute does not apply to the defendant because of its crossing bridges

into the borough of Manhattan, pursuant to special bridge statutes and not under the Railroad Law.

The right to cross the bridges under said special statutes constitutes a mere license and not a franchise.

APPEAL by the plaintiff, The City of New York, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 27th day of March, 1916, as resettled by an order entered in said clerk's office on the 6th day of April, 1916.

The judgment appealed from was rendered upon the decision of the court dismissing the complaint upon the merits after a trial before the court without a jury.

*William E. C. Mayer,* for the appellant.

*Charles A. Collin,* for the respondent.

SHEARN, J.:

This action was brought by the city to recover some $800,000 representing percentages of about $350,000 on gross receipts from the operation of the defendant's railroads within the city of New York during the six years ending September 30, 1907, and penalties thereon amounting to about $450,000, pursuant to the provisions of former section 95 (present section 175) of the Railroad Law as enacted, taking effect June 7, 1892. (See 1 R. S. 157, § 12.)   The first sentence of that section has read, since May 18, 1892, as follows:

" Every corporation building or operating a railroad or branch or extension thereof, under the provisions of this article, or of chapter 252 of the Laws of 1884, within any city of the State having a population of 1,200,000 or more, shall, for and during the first five years after the commencement of the operation of any portion of its railroad, annually, on November first, pay into the treasury of the city in which its road is located, to the credit of the sinking fund thereof, three per cent of its gross receipts for and during the year ending September thirtieth next preceding; and after the expiration of such five years, make a like annual payment into the treasury of the city to the credit of the same fund, of five per cent of its gross receipts." (Gen. Laws, chap. 39 [Laws of 1890,

**200** CITY OF NEW YORK *v.* BROOKLYN, Q. CO. & S. R. R. CO.

First Department, May, 1917. [Vol. 179.

chap. 565], § 95, as amd. by Laws of 1892, chap. 676; now Consol. Laws, chap. 49 [Laws of 1910, chap. 481], § 175.)

The defendant is a domestic street surface railroad corporation organized November 24, 1893, under the General Railroad Law. The certificate of incorporation provided that " the county in which the said railroad is to be located is the County of Queens, State of New York." All of the defendant's franchises for the use of city streets are based upon consents of the proper local municipal bodies granted to other corporations merged with the defendant, which corporations were all in existence prior to 1884. All of the franchises which were granted by the local authorities of the city of Brooklyn for railroads operated by the defendant, whether owned by it or by other corporations, were so granted prior to June 7, 1892, with the single exception of the franchise of July 27, 1893, as amended November 27, 1893, granted to the defendant's predecessor, the Broadway Railroad Company, which said franchise did require the payment of percentages of gross receipts annually at the rate of one per cent when its total annual gross receipts should average $20,000 or less per mile, and on a sliding scale thereafter. The sum sought to be recovered does not include this percentage payable under this particular franchise, but is based wholly upon the requirement of the statute.

At the time of the enactment of former section 95 (now section 175) of the Railroad Law in its present form on May 18, 1892, when it took effect on June 7, 1892, and at the time of defendant's incorporation in 1893, the population of the city of Brooklyn was considerably under 1,000,000, and on January 1, 1898, at the time of the taking effect of the Greater New York charter, the population was still less than 1,000,000. In the year 1900 the population of the borough of Brooklyn was 1,166,582, and in 1905 was 1,358,686. There is nothing to show just when the population of the borough of Brooklyn reached or passed the 1,200,000 mark, but it is assumed for the purposes of the appeal that the population of that borough had increased to 1,200,000 by 1905 and has since exceeded that number. During the first three years of the period embraced in this action the defendant operated its railroads over the Brooklyn bridge to the Park Row terminal in Manhattan.

During the year ending September 30, 1905, it operated continuously over the Brooklyn bridge from the Park Row terminal in Manhattan and part of the time over the Williamsburgh bridge, all of which bridge operation was made possible by track agreements with other railroads and was pursuant to a license granted by the department of bridges pursuant to special bridge statutes, chapter 663 of the Laws of 1897 and sections 595 and 601 of the Greater New York charter (Laws of 1897, chap. 378; Laws of 1901, chap. 466), pursuant to which tolls were exacted by and paid to the city of New York.

The appellant makes two broad claims: (1) Assuming that respondent was not subject to this charge when it was incorporated in 1893 or for the period of twelve years thereafter, during which the population of Brooklyn was less than 1,200,000, it became subject to the charge automatically when the population reached that figure, and, (2) similarly, even if this contention be unsound, respondent became liable to this charge when it extended its operations and entered the borough of Manhattan, for then it was operating a railroad in a city whose population exceeded 1,200,000. The respondent contends that since the taking effect of chapter 676 of the Laws of 1892, making 1,200,000 instead of 250,000 the minimum limit of population of the cities specified in the first sentence of former section 95 (present section 175) of the Railroad Law, that sentence has only required payment of the specified percentages of gross receipts from the operation of railroads built under franchises granted by New York city after May 6, 1884, and that, accordingly, the statute does not apply to receipts from operation in Brooklyn under franchises antedating 1884 or to receipts from operation over the bridges and into the borough of Manhattan, which operation is not pursuant to any franchise granted under the Railroad Law but is pursuant to a license under special bridge statutes. Both sides agree that no change whatever was made in the obligations or in the rights of the respondent by the consolidation of the city of Brooklyn with the city of New York. The basic question, therefore, is the application of the statute.

The legislation governing the requirement to pay percentages of gross receipts from the operation of railroads first appeared in sections 7, 8 and 18 of chapter 252 of the Laws

of 1884, the first general street surface railroad law in this State. The portions of said act of 1884 (Chap. 252) material to the present discussion, as thus originally enacted, read as follows:

" § 7. The local authorities of any incorporated city or village to whom application, under the provisions of this act, may be made for consent to the construction, maintenance, use, operation or extension of a street surface railroad upon any street, road, avenue or highway, may, at their option, provide for the sale of, and sell at public auction the franchise, subject to all the provisions of this act, to so construct, maintain, use, operate or extend such street surface railway. * * *

" § 8. Every corporation incorporated under, or constructing or operating a railroad constructed or extended under the provisions of this act, within the cities of the State having a population of 250,000 or more, as aforesaid, shall for and during the first five years after the commencement of the operation of any portion of its railroad, annually, on the first day of November, pay into the treasury of said respective cities in which its road is located to the credit of the sinking fund thereof, three per cent of its gross receipts for and during the year ending the next preceding thirtieth day of September, and after the expiration of said five years, make a like annual payment into the treasury of said respective cities, for the credit of said sinking funds, of five per cent instead of three per cent of said gross receipts; provided, however, that every corporation now existing and operating a street surface railroad which shall extend its tracks or construct branches therefrom, and operate such extensions or branches under the provisions of this act, or the corporation operating such branches or extensions, shall pay such percentages as aforesaid only upon such portion of its gross receipts as shall bear the same proportion to the whole value thereof as the length of such extension and branches shall bear to the entire length of its tracks.    In any other incorporated city or village the local authorities shall have the right to require, as a condition to their consent to the construction, operation or extension of a railroad under the provisions of this act, the payment annually of such percentage of gross receipts, not exceeding three per cent, into the treasury of said city or village, as they may deem proper."

" § 18.   *   *   *   nothing in this act shall   *   *   *   interfere with or repeal or invalidate any rights heretofore acquired under the laws of this State by any horse railroad company, or affect, or repeal any right of any existing street surface railroad company to construct, extend, operate and maintain its road in accordance with the terms and provisions of its charter, and the acts amendatory thereof."

Chapters 65 and 642 of the Laws of 1886, known as the " Cantor Acts," repealed said section 7 of chapter 252 of the Laws of 1884, and otherwise modified certain of the above-quoted provisions of the act of 1884.   The first Cantor act (Laws of 1886, chap. 65, § 1), as originally enacted, contained the following provisions:

" Section 1.   The local authorities of any incorporated city or village to whom application may be made for consent to the construction, maintenance, use, operation or extension of a street railroad or a railroad or railway for the transportation of passengers, mails or freight over, upon, under, through or across any of the streets, roads, avenues, parks or public places in such city or village, must provide as a condition of the said consent to the use of said street, road, avenue, park or public place, that the right, franchise and privilege of using the said street, road, avenue, park or public place, shall be sold at public auction to the bidder who will give the largest percentage per annum of the gross receipts derived from the operation of said railroad or railway,   *   *   *   provided that in cities having a population of 250,000, or more, such percentage shall in no case be less than three centum per annum of such gross receipts for and during the period of the first five years of the operation of any portion of said railroad or railway, and five per centum per annum of such gross receipts after the expiration of five years."

The foregoing provisions of the first Cantor act of 1886 (Chap. 65) were amended by the second Cantor act (Laws of 1886, chap. 642, § 1) to read as follows:

" Section 1.   The local authorities of any incorporated city or village, to whom application may be made for consent to the construction, maintenance, use, operation or extension of a street railroad or a railroad or railway for the transportation of passengers, mails or freight, over, upon, under or through

any of the streets, roads, avenues, parks or public places in such city or village must provide, as a condition of the said consent to the use of said street, road, avenue, park or public place, that the right, franchise and privilege of using the said street, road, avenue, park or public place shall be sold at public auction to the bidder who will agree to give the largest percentage per annum of the gross receipts of said company or corporation   *   *   *   but this agreement shall not release any such road from the percentages required to be paid by chapter 252 of the Laws of 1884." (See, also, Laws of 1889, chap. 564, amdg. said § 1.)

Section 2 of the second Cantor act (Laws of 1886, chap. 642) provided that none of the above-quoted provisions of that act or of chapter 65 of the Laws of 1886 should apply " to street surface railroad companies heretofore organized in cities or villages of less than 40,000 inhabitants." Chapter 622 of the Laws of 1887 raised such minimum population limit to 85,000. Chapter 281 of the Laws of 1889 raised such mimimum population limit to 90,000. The act of 1889 also excepted companies " now organized, or hereafter to be organized." It adopted the United States census of 1880.

The substance of the foregoing provisions of the Laws of 1884, chapter 252, and of the two Cantor acts of 1886 (Chaps. 65 and 642, as amd.) was re-enacted in sections 93 and 95 of the Railroad Law of 1890 (Gen. Laws, chap. 39; Laws of 1890, chap. 565), taking effect May 1, 1891.

The provisions of section 8 of chapter 252 of the Laws of 1884 have undergone no material change, either in language or substance, except the changes in the 1st clause of the 1st sentence, which, as originally enacted, in section 8 of the act of 1884 (Chap. 252), read as follows: " Every corporation incorporated under, or constructing or operating a railroad constructed or extended under the provisions of this act, within the cities of the State having a population of 250,000 or more, *   *   *   shall   *   *   *   pay   *   *   *."

As re-enacted in section 95 of the first revised Railroad Law of 1890 (Laws of 1890, chap. 565, taking effect May 1, 1891), the 1st clause of the 1st sentence of the section read: " Every corporation, building or operating a railroad, constructed or extended under the provisions of this article, or of chapter 252

of the Laws of 1884, within any city of this State having a population of 250,000 or more, shall * * * pay * * *."

It will be noted that in this amendment the words " incorporated under," following the words " every corporation " in the original statute, were omitted.

By the 1892 re-revision of the Railroad Law (Laws of 1892, chap. 676, taking effect June 7, 1892) the 1st clause of the 1st sentence of section 95 was amended to read, as it still reads in present section 175 of the Railroad Law, as follows: " Every corporation building or operating a railroad or branch or extension thereof, under the provisions of this article, or of chapter 252 of the Laws of 1884, within any city of the State having a population of 1,200,000 or more, shall * * * pay * * *."

Sections 93 and 95 of the Railroad Law of 1890 (Chap. 565, taking effect May 1, 1891) show on their face that the substance of the foregoing provisions of the Laws of 1884, chapter 252, and of the Cantor acts of 1886 (Chaps. 65 and 642, as amd.), were re-enacted, in almost identical language and without any change in substance, except that in section 93 of the Railroad Law the minimum population limit of a *city* in which the franchise was required to be sold at public auction was placed at 90,000.

Further, as indicating an intention that the revision should make no change in the substance of the law, the Railroad Law of 1890 (Chap. 565) while expressly repealing (§ 180) the Laws of 1884, chapter 252, and the Cantor acts of 1886 (Chaps. 65 and 642), also expressly provided (§§ 181, 182) that such repeal should not affect or impair any act done or right accruing, accrued or acquired prior to May 1, 1891, under or by virtue of the laws so repealed; but that such a right might be asserted, enforced or prosecuted as fully and to the same extent as if such laws had not been repealed; and that the provisions of such revised Railroad Law of 1890, " so far as they are substantially the same as those of laws existing on April 30, 1891, shall be construed as a continuation of such laws, modified or amended according to the language employed in this chapter, and not as new enactments."

By the Statutory Construction Law of 1892 (Gen. Laws, chap. 1 [Laws of 1892, chap. 677], § 31; Id. § 32, as amd.

**206**   City of New York *v.* Brooklyn, Q. Co. & S. R. R. Co.

First Department, May, 1917.                    [Vol. 179.

by Laws of 1894, chap. 448) and by the General Construction Law of 1909 (Consol. Laws, chap. 22 [Laws of 1909, chap. 27], §§ 93, 95) similar provisions were made generally applicable to all the Revised General Laws and to all the Consolidated Laws.

The above-quoted provisions of the earlier acts as to the sale of a franchise at public auction to the bidder agreeing to pay the highest percentage of gross receipts were re-enacted in section 93 of the Railroad Law of 1890; and the provisions imposing an absolute liability for the annual payment of three per cent of gross receipts for the first five years after the commencement of the operation of a proposed new railroad, and of five per cent thereafter, were revised in section 95 of the Railroad Law of 1890.

After June 7, 1892, the 3d sentence of section 95 of the Railroad Law was the only statutory provision which required street surface railroad corporations operating railroads outside of New York city to pay a percentage of their gross receipts from the operation of such railroads.

Such 3d sentence of section 95 (present section 175) has not been materially changed since its first enactment as the 2d sentence of section 8 of the act of 1884 (Chap. 252), and it still reads as follows: " In any other incorporated city or village the local authorities shall have the right to require, as a condition to their consent to the construction, operation or extension of a railroad under the provisions of this article, the payment annually of such percentage of gross receipts, not exceeding three per cent, into the treasury of the city or village as they may deem proper."

The population of each of the two cities, New York and Brooklyn, has been more than 250,000 since 1865. With the single exception since 1890 of Buffalo, the cities of New York and Brooklyn were the only cities in the State, during the period from May 6, 1884, to June 7, 1892, which had a population of 250,000 or more; and, therefore, with the exception of Buffalo, they were the only cities during that period subject to the provisions embodied in the 1st sentence of section 8 of the act of 1884, from May 6, 1884, to May 1, 1891, and in the 1st sentence of section 95 of the Railroad Law from May 1, 1891, to June 7, 1892.

Certain features stand out clearly from this survey of the

development of these statutes.    (1) At all times the charge, when exacted, was purely compensation to the municipalities for their consent or franchise granting rights to use their streets.    (2) At all times, the exaction of the minimum charge specified in the statute was optional with the local authorities, excepting only in Buffalo, Brooklyn and New York. (3) After June 7, 1892, the exaction of the charge was required only in the city of New York.    (4) The requirement for selling the right of using the streets to the highest bidder who will agree to pay a percentage of gross receipts no less than the statutory three per cent rate was limited to Buffalo, Brooklyn and New York until June 7, 1892, and thereafter applied only to the city of New York.    (*Adamson* v. *Nassau Electric R. R. Co.,* 89 Hun, 261.)    (5) The original act of 1884, imposing the charge, was prospective, referred to new franchises and did not apply to any corporations except those (a) incorporated under the act, or (b) constructing or operating a railroad *constructed or extended under the act,* which excludes the respondent and its constituent companies, with the possible exception of extensions under the act of 1884, if any, between 1884 and 1892, after which last date, no charge was imposed by the statute.    (6) The Cantor acts of 1886 were prospective, referring to applications for local consents thereafter granted, which excludes the respondent and its constituent companies, with the exception of the Broadway Railroad Company, above referred to, whose franchise of July 27, 1893, was granted upon a requirement for the payment of percentages, as to which no question arises.    (7) The revision of 1890 not only clearly applies to future building and operating under new franchises but is so phrased that, with the possible exception above noted in (5), it is impossible to include the respondent, for it applies only to railroads " constructed or extended under the provisions of this article, or of chapter 252 of the Laws of 1884."    As if to emphasize this limitation and make it still clearer that there was no intention of requiring the charge to be exacted of all companies incorporated under the provisions of the General Railroad Law or under the act of 1884, irrespective of the time when they were constructed or extended, there was deliberately omitted in the revision the words " incorporated under " appearing in the previous statute, so that

instead of reading " Every corporation incorporated under * * * the provisions of this act * * * shall * * * pay," it read, " Every corporation, building or operating a railroad, constructed or extended under the provisions of this article, * * * shall * * * pay." (See *Pennsylvania Steel Co.* v. *New York City Ry. Co.*, 191 Fed. Rep. 216, 220, 221, 226.)

It is, therefore, entirely clear that when the respondent was incorporated in 1893 and took over the operation of the railroads of its constituent companies in the city of Brooklyn, the population of which was far under the 1,200,000 limit fixed by the revision of 1892, the statute requiring the exaction of a gross receipts charge did not apply to it. In fact, it was held in the *Pennsylvania Steel Co. Case* (*supra*) that the act did not apply to New York city railroads unless they were enjoying franchises created subsequent to the act of 1884.

Nevertheless, the corporation counsel insists that the act must apply to the respondent, because when Brooklyn's population passed the 1,200,000 mark the respondent was operating a railroad in a city having the population fixed by the act of 1892 and was literally within its terms. The basis of this argument is two-fold.

It is said, *first,* that the respondent took its charter of incorporation under the conditions and with the burdens prescribed by the Railroad Law, and that it does not necessarily follow from the fact that its constituent companies were exempt from the exaction of a charge upon gross receipts that the corporation succeeding to their rights succeeded to their " exemptions." (Citing *Rochester R. Co.* v. *Rochester*, 205 U. S. 236, 254.) This is another way of saying that privileges or exemptions, which are personal, do not pass when the corporations enjoying them are merged into another corporation. In the *Rochester* case the original corporation was free from any obligation to share in the expense of paving certain streets because at the time of its incorporation there was no statute requiring it. Its successor corporation was naturally defeated in claiming that it could not be required to share the expense of paving under a subsequent statute merely because its predecessor corporation was not liable. That decision does not appear to have even a remote bearing upon this controversy. There is here no

question of exemption. No contention is made that the franchises of the respondent are exempt from taxation. The question is not even raised whether, when a consent or franchise has been granted by local authorities for the use of streets and the same has been accepted and thereafter continuously enjoyed, it is competent subsequently to impose other or additional terms for enjoying a vested right under the guise of imposing new terms in consideration for the right to incorporate and operate under a new statute. The question is not whether additional compensation could be exacted, but whether the statute does impose new terms. The corporation counsel insists that the statute does apply to the respondent and that the intention of the Legislature was that the gross receipts charge should automatically become operative when the population of Brooklyn reached the 1,200,000 mark because, as he argues, it was obligatory upon the local authorities in Brooklyn to require the exaction of this charge, and if it were not exacted the franchises of the respondent " would be incomplete." This is insisted upon over and over again in spite of the patent fact, evidenced by the foregoing survey of the history of the statute, that in 1893, when the respondent was incorporated and took over the operation of its constituent companies in the city of Brooklyn, there was no obligation whatever upon the local authorities of any city in the State, except the city of New York, to exact a gross receipts charge, and, therefore, the respondent's franchises were complete, vested and unassailable. Failing in this contention, it is then argued that the statute should be interpreted so as to read that the gross receipts charge shall become operative at such time in the future when the city of Brooklyn may attain a population of 1,200,000. Assuming that the statute applied to franchises granted by local authorities prior to 1884, which clearly it does not, a sufficient answer to the contention is that the statute does not contain the provision sought to be interpolated into it and " All doubts as to the construction of a taxing statute are to be resolved in favor of the taxpayer." (*City of Rochester* v. *Fourteenth Ward Assn.*, 183 N. Y. 23; *People ex rel. New York Mail & N. T. Co.* v. *Gaus*, 198 id. 250.)

It may be said further in answer to this argument that

imputing any such unexpressed intention to the Legislature at the time of the revision of 1892 involves shutting one's eyes to the facts that furnished a good and sufficient reason for raising the population requirement, fixed at 250,000 in the act of 1884, to 1,200,000, fixed in the revision of 1892. The record indicates that between the enactment of chapter 252 of the Laws of 1884, imposing the gross receipts charge upon the granting of new franchises in the cities of New York and Brooklyn and, after 1890, in the city of Buffalo, and down to June 7, 1892, when the requirement was lifted except as applicable to the city of New York, there was a practical suspension of taking out new franchises for street surface railroads in the city of Brooklyn, which tended to result in a practical monopoly of that business in the hands of corporations which had been granted franchises prior to May 6, 1884. It is not at all unreasonable to conclude that the purpose in raising the minimum population limit from 250,000 to 1,200,000 in 1892 was to encourage the building of new street surface railroads on new streets in Brooklyn and do away with the restriction which naturally tended to retard the development of the outlying territory of Brooklyn for nearly ten years. It can hardly be assumed, as a matter of common fairness, that it was the intention of the Legislature to induce street surface railroad corporations to take out new franchises for new street railroads free from liability for payment of percentage of gross receipts from their operation and then, after the railroads should be constructed and fairly under operation in the territory fostered and built up by them, subject them to payment of a charge which was not asked or bargained for when the local authorities granted them franchise rights to use the streets. There appears to be no sound basis for the contentions advanced by the corporation counsel on this phase of the case, either in law or fair dealing, and the arguments run counter to commonly accepted ideas relating to the integrity of contracts.

The appellant, however, advances another ground of liability on the part of the respondent to pay a percentage upon its gross receipts from operation. It is contended that when it crossed the East River bridges and entered the borough of Manhattan, it voluntarily brought itself within the category of corporations referred to in the act of 1892, because it was then a railroad

organized under the Railroad Law and operating thereunder in a city of more than 1,200,000 inhabitants, and not pursuant to any franchise antedating 1884, but under a new franchise. But the defendant's operation over the bridges is not under the Railroad Law; it is pursuant to the special bridge statutes, under which it rents the bridge railroad property and pays the city tolls therefor. The railroad tracks on that portion of the Brooklyn and Williamsburgh bridges and bridge terminals, which have been located in the borough of Manhattan, were not street surface railroad tracks, and were not built and have not been operated under either article 4 (now article 5) of the Railroad Law or chapter 252 of the Laws of 1884. Neither is the respondent operating over these tracks pursuant to any new franchise, for, as was held in *Schinzel* v. *Best* (45 Misc. Rep. 455; 109 App. Div. 917), the agreements authorizing this operation constitute a mere license and do not amount to any franchise. As the percentage is only payable by corporations building or operating under the Railroad Law or under the act of 1884, it does not apply to the respondent because of its crossing the bridges under a license.

The judgment should be affirmed, with costs.

CLARKE, P. J., LAUGHLIN, DOWLING and DAVIS, JJ., concurred.

Judgment affirmed, with costs.